**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

July 25, 2025

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Fathy Hussein, 24-CR-272 (DG)

Dear Judge Gujarati:

I submit this letter in advance of Mr. Hussein's sentencing before this Court on August 12, 2025. Seven years is the mandatory minimum sentence, the Guidelines sentence, and the sentence recommended by the Office of Probation in Mr. Hussein's case. For the reasons detailed below, seven years in custody is more than sufficient to achieve the goals of 3553(a), including punishment, general and specific deterrence, and rehabilitation.

I.    **Objections to the Pre-sentence Report**

a.  **Employment Record**

The PSR correctly reflects that Mr. Hussein was earning $100 a day as an assistant and $150 a day as an apprentice with his former employer, RRR. PSR at ¶ 78. However, based on that reported income, the gross monthly income should be between $2,000-3,000, not $650.

b.  **Recommended Special Conditions**

Probation recommends a special search condition that authorizes the search of "computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media," in addition to his person, property, house, residence, vehicle, papers, and office. PSR at ¶ 106. Defense counsel objects to the inclusion of electronic devices, communications, and media. This case did not involve the use of electronic devices or communications sufficient to justify what the Supreme Court has recognized as a qualitatively and quantitatively different type of search from other searchable items because of cell phones', and other electronic devices', "immense storage capacity," their ability to hold many different types of information, and the highly sensitive nature of

1

that information. *See Riley v. California*, 573 U.S. 373, 393-95 (2014). Indeed, Second Circuit precedent requires far more. *See United States v. Salazar*, No. 22-1385-cr, 2023 WL 4363247, at *3 (2d Cir. July 6, 2023). The Court should strike this special condition.

## II. A 7-Year Sentence is Sufficient Under Both the Guidelines and 3553(a) Factors

### a. Mr. Hussein's personal history and characteristics weigh in favor of a 7-year Guidelines sentence.

#### i. Background

As detailed in the PSR, Mr. Hussein was raised in a multi-generational, multi-borough family. Mr. Hussein is not one to complain, and generally speaking, his childhood was free from abuse. But Mr. Hussein's childhood was also challenging in unique ways. He never really knew his father, who lived in Egypt. When Mr. Hussein was approximately four years old, his mother moved in with her new husband, Jesse Johal, and they started a family together. But Mr. Hussein did not move with her.

Instead, Mr. Hussein continued living with his maternal grandparents, two aunts, and his uncle in Bay Ridge, Brooklyn, while his mother, Jesse, and his half-brother Amrit lived across the city in Richmond Hill, Queens. Growing up, Mr. Hussein called his grandparents, Zainab and Ali, "mom" and "dad;" he called his mother Jouda "mama." His mother, Jouda, was the eldest of her siblings and Mr. Hussein saw his aunts and uncles, who are about 10-15 years older than him, more like older siblings. Jouda worked long hours at a Greek-owned fur coat factory, while his grandmother was a homemaker and could serve as his primary caretaker. His grandfather, who was an electrician, owned his own business and worked with many local businesses, fixing refrigerators in delis and restaurants. As a pre-teen and teenager, Mr. Hussein would accompany his grandfather on jobs and his grandfather would pay him small sums to hold his tool bags for him.

When Mr. Hussein was four years old, he was diagnosed with lead poisoning, likely the result of eating paint chips from the walls of his grandparents' home in Bay Ridge. *See* PSR at ¶ 48. His family believes this may have contributed to his ADHD diagnosis several years later. Throughout his childhood, Mr. Hussein found it difficult to focus, particularly in school, but struggled with the side effects of medications prescribed to treat his ADHD. Mr. Hussein worries that the lead poisoning may have impacted his memory—it is often difficult for him to accurately recall dates and things that happened in the past.

At approximately 14 years old, Mr. Hussein decided to move from Bay Ridge to Richmond Hill to live with his mother and stepfather. At that time, he was chafing at his uncle Ahmed's attempts to impose strict household rules at his grandparents' home in Bay Ridge. Ahmed created strict rules about doing homework and getting in trouble at school—rules that only applied to Mr. Hussein, as the only minor in the household. When Ahmed grounded Mr. Hussein, he would escape to stay with his mother in Richmond Hill. Mr. Hussein got along well with Jesse and his little stepbrother, Amrit. Jesse, who worked as a limousine driver, taught Mr. Hussein how to drive and was generally kind to him. Mr. Hussein also enjoyed having a kid close to his age in the home, which kept him out from under the intense scrutiny of a one-child household.

In hindsight, Mr. Hussein is not sure this was the right decision. In contrast to Bay Ridge, which he viewed as a peaceful, middle-class neighborhood, he describes his family's neighborhood in Richmond Hill as "the hood." Mr. Hussein attended high school at Queens Transition Center, a District 75 school in Richmond Hill. Despite having a good relationship with his mother and stepfather, he didn't feel he could confide in them about the challenges he was facing in the neighborhood and at school and would instead try to figure things out on his own.

After getting into trouble at QTC, he moved back to Bay Ridge to live with his grandparents and attend Sunset High School in nearby Sunset Park. Mr. Hussein eventually stopped going to school in 11th grade, when he was "19 or 20 years old," and decided he would rather get a job and be able to support himself. He got a job working in the deli department at Key Food in Bay Ridge and worked there for about one year. But he only made approximately $300 per week, so when his uncle Ahmed, who works for NYU in building maintenance, offered him the opportunity to start working side jobs with him in air conditioning and refrigeration, Mr. Hussein jumped at the opportunity. He worked with him on and off for years, making $150 a day and learning the ropes of refrigeration.

At the time of his arrest, Mr. Hussein was living with his stepbrother in Richmond Hill, very close to his mother and stepfather, where he continued to reside between inpatient programs until his remand in October 2024. In May 2024, while Mr. Hussein was residing in an inpatient treatment program, his stepfather Jesse was diagnosed with cancer. Despite radiation treatment, Jesse's cancer progressed rapidly and in May 2025, he passed away. As a result of his remand to MDC, Mr. Hussein did not have the chance to see Jesse before he passed. He deeply regrets not only missing the chance to spend time with Jesse, but also his inability to be at home with his mother to support her through this tragic loss.

### ii. Mr. Hussein's participation in the September 2022 robbery was motivated by his drug dependency.

Mr. Hussein's participation in the instant offense was motivated by a desperate need to fuel his drug dependency. He deeply regrets his involvement and is actively seeking help to combat the drug dependency that got him into this situation in the first place.

Mr. Hussein was first exposed to opioids when he was prescribed Percocet following a work-related injury in 2020. When he learned that an acquaintance in his family's neighborhood had access to Percocet, he began using Percocet recreationally. But his dependency became dramatically worse about four years ago, after leaving his job with R&R. By age 28, Mr. Hussein was using Percocet every weekend, spending approximately $100-150 per week.

Mr. Hussein struggled to find stable work after leaving his job with R&R. Without a regular work schedule and becoming increasingly anxious about his unemployment, Mr. Hussein began to succumb to drug dependency. By the beginning of 2022, he was using Percocet daily, popping a pill every couple hours and spending approximately $300 per week. But without a job, he struggled to support his drug dependency. A little before his 29th birthday, in May 2022, he began using fentanyl. His tolerance had gotten so high that Percocet was no longer impacting him, and fentanyl was cheaper to get.

Mr. Hussein would borrow money from family and say it was for something else, then spend it on drugs—behavior he now feels ashamed of. In this same state of desperation, Mr. Hussein

3

agreed to participate in the instant offense, with the hope of making some easy money that he could spend on opioids. Like borrowing money from his family under false pretenses, Mr. Hussein deeply regrets the conduct he engaged in to support his drug habit.

Mr. Hussein agreed to participate in the instant offense while in the throes of opioid addiction. He was consuming a potent combination of Percocets and fentanyl, which significantly clouded his judgment and left him focused exclusively on how he could find money to get his next fix.

### b. A 7-Year sentence is sufficient to provide rehabilitative programming and treatment for Mr. Hussein's substance dependency.

Mr. Hussein was arrested for the September 14, 2022 robbery more than a year after it occurred. Despite his ongoing struggle with drug dependency, he did not participate in any other robberies or criminal conduct between the instant offense on September 14, 2022 and his arrest on November 22, 2023. Well before his arrest in November 2023, Mr. Hussein recognized that he needed help to combat his drug dependency. He began attending a methadone clinic at St. Joseph's Medical Center near his family's home in Queens. While the methadone clinic has helped Mr. Hussein reduce his drug use and mitigate the harm he faces as a drug user, he struggled to stop using cold turkey.

After his arrest, Mr. Hussein enrolled in the first substance abuse treatment program he has ever participated in. As the Court is aware, his progress was not linear, and he continued positive test results despite periods of sobriety. His ongoing drug use ultimately resulted in his remand to MDC Brooklyn. His continued drug use not only cost him his liberty; he also missed the opportunity to spend time with his stepfather and family before he passed away from cancer in May 2025.

Mr. Hussein recognizes how critical his sobriety is not only to his success in custody and on supervised release following this custodial sentence, but also to his own long-term well-being and relationships with the people he loves. He has reflected on the increasingly more common fatal overdoses from tainted fentanyl and realizes that continuing to use will only jeopardize his life. Despite the fact that he will not be able to receive a reduction to his sentence as a result of completing RDAP, Mr. Hussein asks that the Court recommend RDAP, so that he can continue working towards his long-term sobriety while in custody.

He has no objection to a special condition of supervision requiring an evaluation for substance abuse treatment, but asks that the determination of whether substance abuse treatment is appropriate be deferred to that time, given his mandatorily lengthy custodial sentence. Mr. Hussein is committed to moving past this difficult chapter of his life and securing stable employment once he is released from custody. He is fortunate to have the support of his mother, Jouda, and his aunt, Fatima, throughout this process.

### c. Need to avoid unwarranted sentencing disparities.

While serious, the nature and circumstances of the single robbery Mr. Hussein is alleged to have participated in are not unique or particularly aggravated. Mr. Hussein did not personally possess, use, or brandish a firearm. He did not engage in violence or use force against any employee

or bystander at the tobacco shop. The government has not provided any information suggesting Mr. Hussein engaged in any planning before or additional conduct after the robbery itself.

Mr. Hussein's conduct is comparable or less aggravated than that of many other individuals charged with Hobbs Act robberies and 924(c) related to armed robberies in the Eastern District of New York.

For example, in *United States v. Bryant*, 22-cr-463 (CBA), Mr. Bryant pointed a firearm at a convenience store clerk while his co-defendant, Mr. Jean-Louis, directed the clerk to put cash in a backpack. Both defendants were allowed to plead to one Hobbs Act robbery count. Mr. Bryant was sentenced to 76 months; Mr. Jean-Louis, whose role was identical to Mr. Hussein's, received 43 months.

In *United States v. Browning*, 24-CR-47 (RER) and *United States v. Johnson*, 24-CR-68 (RER), Mr. Browning and his co-defendant robbed a smoke shop at gunpoint. Both Mr. Browning and his co-defendant brandished firearms and the co-defendant pointed a gun at the cashier's head and grabbed her, pushing her to the ground. Both Mr. Browning and Mr. Johnson were offered the opportunity to plead guilty to one count of Hobbs Act robbery—no 924(c) or 922(g) count, despite liability for both. Mr. Johnson was sentenced to 60 months in custody; Mr. Browning received 72 months.

In *United States v. Mohammed*, 22-CR-454 (EK), two brothers were indicted on three counts of Hobbs Act robbery and three 924(c) counts for committing three convenience store robberies of cash and marijuana over the course of several months. In one robbery, detailed in the complaint, Grant Mohammed hit one of the deli employees with a cane causing a laceration to his hand; meanwhile, Angel Mohammed pointed a firearm at two employees, took one of the employees' phones and threw it. *United States v. Mohammed*, 22-CR-454 (EK), Dkt. No. 1 at 3. They were both permitted to pled to two Hobbs Act robberies, each. Angel received 72 months; Grant received 84 months.

In *United States v. Jauhar Tinsley*, 22-CR-90 (BMC), Mr. Tinsley entered the victim's car and displayed a firearm, then directed his co-defendant, Tavares, who had approached the driver's side of the victim's vehicle, to pistol-whip the victim before Mr. Tinsley, Tavares, and three other co-conspirators removed property from the victim and his vehicle, including a cell phone, several pairs of headphones, a designer bag, $600 in cash, and the victim's personal items. During the robbery, a co-conspirator took a gun and pulled the trigger—the victim heard the hammer of the gun click but no shot was discharged. Mr. Tinsley was allowed to plead to one 7-year 924(c) count and was sentenced to 84 months; Tavares pled to one Hobbs Act robbery an received 54 months.

In *United States v. Sanchez*, 21-CR-465 (PKC), Mr. Sanchez was indicted on one Hobbs Act robbery count, Hobbs Act robbery conspiracy, and a violation of 924(c), related to the robbery of more than $1 million from the owner of a check cashing business. The armed robbery involved two other co-defendants with firearms, one of whom allegedly pistol-whipped the victim; Mr. Sanchez did not possess or use a firearm but participated in casing both the business and the owner's home and blocked the driveway preventing the owner's escape during the robbery. Mr. Sanchez was pled to one count of Hobbs Act robbery and was sentenced to 32 months.

In *United States v. Baptiste*, 20-CR-520 (KAM), Mr. Baptiste was implicated in at least seven commercial robberies committed over an approximately 35-day span. They identified Mr. Baptiste

5

entering, brandishing a firearm or simulating a firearm under clothing, and demanding money or valuables during each of these armed robberies. One was a gunpoint robbery of a gas station in Brooklyn; another was a gunpoint robbery of a Boost Mobile store, during which Mr. Baptiste pointed a firearm at a store employee and told the employee and a customer with a child in a stroller to stay in a back room. Mr. Baptiste pled to two Hobbs Act robbery counts and was sentenced to 84 months concurrent on the two counts.

In *United States v. Boney*, 22-CR-381 (MKB), Mr. Boney and a co-defendant were indicted for seven Hobbs Act robberies, one Hobbs Act conspiracy, and one 924c. On multiple occasions, Mr. Boney and his co-defendant targeted victims leaving the Diamond District and followed them home, eventually robbing them at gunpoint. During one robbery, the defendants pistol-whipped an elderly man, requiring stitches; another robbery also resulted in bodily injury. Mr. Boney pled to one 924(c) count and was sentenced to 84 months.

In contrast to Bryant, Browning, Johnson, Mohammed, Tavares, Baptiste, and Boney, Mr. Hussein did not personally possess a firearm or engage in any sort of violence. Nor did any physical injury result from either Mr. Hussein's or his co-conspirators' actions. Further, unlike Mohammed, Baptiste, and Boney, who committed multiple gunpoint robberies, Mr. Hussein was only involved in one robbery. And in contrast to Sanchez, where the defendants stole over $1 million, the total loss amount here was not extraordinary—only approximately $3,000 in cash and $1,000 in merchandise.

Further, unlike most of the defendants cited above, Mr. Hussein has never previously been convicted of a felony and, before he was remanded to MDC Brooklyn, had never done jail time. As a result, Mr. Hussein's criminal history score—which is rendered irrelevant by the applicable Guideline—is significantly lower than the defendants in most of these comparator cases. Additionally, even a short custodial sentence is likely to have a more significant deterrent effect.

### III.  Conclusion

For the reasons detailed above, the Court should follow probation's recommendation and impose a sentence of seven years in custody, followed by two years of supervised release.

Sincerely,

**NORA K. HIROZAWA**
Trial Attorney
Federal Defenders of New York, Inc.